The next case for argument is 16-2336, Instradent USA v. ITC. The next case for argument is 16-2336, Instradent USA v. ITC. So now that you've had a chance to learn something about the Tucker Act, you can go forward on your case. Thank you, Your Honor. That was quite an education. So, Your Honor, I'd like to reserve seven minutes for development. There's three points I'd like to address. Two of them are actually combined. The first is that the commission's piece-by-piece analysis of the facts relating to the publication is legal error. The commission discounted relevant evidence and their discounting of relevant evidence amounted to a denial of due process. And then finally, there's the issue of intervener's claim construction, where they're proposing an alternative ground now of affirmance, wherein the coronal region no longer need to permit bone relapse. That was never litigated in the investigation. So there's a whole lot of defenses, invalidity and non-infringement, that could be directed to that instruction that were never heard by the ITC. So first, I'd like to say, Your Honor, that there is abundant evidence of Riker establishing the Alpha Bio Catalog. It was distributed by March 2003. I know. Well, you're trying to... I mean, what's otherwise the standard of review? The standard review here, Your Honor, is de novo on legal issues and substantial evidence on... So I know your preferred route would be to just establish this as a de novo review, but your de novo argument is the legal error is they considered the facts individually as opposed to the totality of circumstance. That's... That's what they said they did, Your Honor. So what did they need to say that they didn't say that would satisfy you, that they in fact did consider the totality of the circumstances? Well, what they should have done respectfully is when there were two facts, for example, sales in Israel and use of the catalog as a training device, the court looked at each one of those and said, well, there were sales, but sales in Israel don't matter because that's not on a same year. Fair enough. But it does show sale of the product. Then they looked at the Dr. Fromich's testimony regarding use of the catalog in training classes, and they said, well, there's no specific thing that says he actually used the catalog before the critical date, May 23rd, 2003. But... But... By definition, any trial court judge who is walking through pieces of evidence will look at each of them individually. The question is whether or not there's enough language or diction in the overall opinion to give us comfort that it was... That they really looked at the totality of it. When they talked about giving pieces of evidence specific weight or finding certain pieces of evidence had more probative value or less probative value, doesn't that give us the comfort that they did an overall totality of the evidence analysis? It doesn't, Your Honor, because the example I was just giving you was they looked at this piece of evidence, they looked at that piece of evidence, and what they didn't consider is that there was testimony that this implant was radically new and radically different than anything anybody had ever seen, supposedly. And yet the court accepted a turning argument from the intervener. Can you just... Can you paint a quick point? I am. How those two fact findings, if only considered together, would have led to the conclusion that this was a publicly available, publicly accessible catalog in March 2003. That's excellent, Your Honor, and that's exactly where I'm going. If this is a radically new implant, you are not going to begin selling it in January or February of 2003, and then not begin training your dental clinicians until after May. So clearly, this thing was... I mean, the catalog was built, it was used for training, and it is a reasonable inference that if you're going to have doctors out there implanting this radically new implant... In Israel. In Israel, they need to be trained, and Dr. Fromage said the catalog was used in that training, and it is the combination of those two facts that provide a sum that's greater than the parts. But we're talking about a gap between the alleged publication in March of 2003, and then your critical date in May 2003, and so, you know, there's some ambiguity here over whether the training sessions could have used the catalog in that time frame. You're right, Your Honor, and that's why you have to look at the other facts, and that's why you keep saying this is a totality. So you look at Mr. Karman's email from, who is a co-inventor, to the in-house counsel at the intervener, saying this was a publication between December 2002, which is when the update journal was first submitted, and March 2003, when the catalog was presented at the International Dental Show in Cologne, Germany. So we know that, you know, there's a guy who says it was a publication, and it was published, and he's talking about specifically for purposes of prior art. He says, as you know, and this is Appendix 2843, as I wrote you before, the attached publications of which one was the catalog, the other was the update journal, are an early version of the SPI implant, which were published by Alpha Bio in December 2002 and March 2003.  They were the early version because they did not have the palm cone or the palm tree core that's described in Figure 6 of the 977 patent. So in fact, those early implants were exactly like what was being sold. I mean, those were exactly like what was being sold. These are all factual disputes. You are debating the factual findings made by the NTC. What language do you find where they said, we conclude that each piece of evidence has to stand on its own and be enough? I don't see that in the opinion. I don't read that in the opinion. Your Honor, where I see that is when I read through their analysis, as I gave you, for example, they look at the publication. They say, well, Dr. Frumovich acknowledges that he prepared it for the 2003 Cologne trip, but he just can't remember. Well, how else do you walk through pieces of evidence? In other words, for them, what they did was to say, each piece of evidence has shortcomings in and of itself, and then collectively, they don't have sufficient weight or probative value to convince me that the record is sufficient to show that it was publicly available. I can't even fathom any other way to walk through your pieces of evidence. Your Honor, I understand that, but what they're not doing is making any connections between them. So they look at Mr. Karman's email, and they say, well, he didn't understand what publication meant. And that was another piece of evidence, when they submitted the IDS to the PTO, and they said the catalog should be considered as prior art before the critical date. And now there is some dispute between the parties, oh, well, and I would say the commission sort of implies this ironclad rule that it's been an IDS, it can never constitute an admission. And they cite Abbott, which says, mere listing is not enough to constitute prior art. And then they look at RescueNet, where the court specifically said, no evidence of public availability was provided for manuals and questions. But there are cases from this court, like Golden Bridge versus Apple, 758 Fed 3rd, 1362, at 1366, 2014. Ekian versus Home Depot, Inc., 1004, Fed 3rd, 1299, at 1303, 1304, where the court, this court has held, well, you can say things in an IDS that constitute express admissions. That was in the context of limiting claims scope. But this ironclad rule, that no matter how expressly you say something in IDS, it just never counts. Something that you can say in an IDS can limit claims scope? Yes. So that's when, are you saying in those cases, someone filed an IDS listing, and then in addition to filing the listing, they provided some commentary on the prior art that was presented in the IDS list? Yes, sir. And then those commentaries were used as a means for limiting the claims scope? That's correct. That's what the Echian Act says. OK. Well, that's not quite the same thing as admitting that references listed on an IDS are, in fact, prior art, in the same way as, say, the background section of your patent, where you say, here are the following interesting things in the prior art, and here's our great contribution over that. Sure, Your Honor. But when you list something in an IDS, if you do not know what the date is, then you put unknown or circa 2003. If they had circa 2003, we wouldn't be having this argument. But they specifically said, for purposes of prosecution, whatever that means, this should be considered as published prior to the critical point. And that's the key point, when you said, whatever that means. Right. Because the question, the way I understand the ITC reaching a conclusion is, there's some ambiguity in the listing in the IDS. When you say, for purposes of this examination, consider this published before May 2003. You're right. There's probably one way of reading that as saying, we admit that this is prior art. And we admit that this was published and publicly available before May 2003. On the other hand, there's another way to read that same language as, for purposes of this examination, assume that this was published before May 2003. In other words, I want you, Mr. Examiner, to look at this reference. I'm not sure if it's prior art, but for purposes of examination, assume that it is. That's another way to read that entry. So why is that so unreasonable to conclude? Well, Your Honor, for the same reasons as described in Ecke and Home Depot, which is that the prosecution history has a public notice function. And when you say something there, you ought to be bound by it. And to say, for purposes of prosecution, if for the purposes of prosecution, it wasn't there for determining patentability, then why in heaven's name was it there? That just doesn't make sense. Again, now we're back to a clear error argument, right? You're saying they clearly erred in not attributing absolute admission to that. You could characterize it that way, Your Honor. I do believe it was clear error. I believe it was error in the legal analysis. Because you have all of these facts, and there's many of them, and yet each one individually, they don't connect them. They look at each one in isolation. As I say in isolation, they weigh them in isolation. They say, well, sales in Israel, it's not on sale, not a problem. Then they look at the IDS, where it says consider prior, and then they don't. And then they say the inventor's email saying this was published, and it wasn't. And then you also have, of record, the Mercer letter that went to the Israeli Patent Office that said this was on sale. I'm sorry, it was not on sale, but the catalog was a publication. As a matter of fact, this catalog, which is Appendix 2761, came from that company. And interestingly enough, this catalog was never produced in Barnard Discovery by the interveners. We had to go to a third party to get it. Before we run out of time here, let me just ask you a process question. We've had some information, some documentation with regard to the PTAB appeal involving this patent. What is your view in terms of the impact, let's say hypothetically, that we were to affirm what the ITC did here? What, if any, impact would that have, in your view, on the subsequent case, which I understand is on appeal somewhere here or somewhere in the process? Well, I would think that under blonde tongue, if the patent is subsequently held invalid by yourselves, because this will be coming to you in the IPR, then the LAO goes away. So whatever is decided here may ultimately not matter. And just to let you know, I wasn't trying to waste your time. I actually asked that this case be postponed. No, I appreciate that. But there's something happening now in terms of, is there an order outstanding that's being effectuated? Not really, Your Honor. Now, here's where you might get angry at me. The limited exclusion order, we're not contesting it. It's there. The respondents stopped shipping the infringing product, allegedly infringing product, into the country back in December 2014. So we actually suggested to the commission that we'd be happy to just leave the LAO in place until the two cases can be synced up, because you're right. In the IPR, we actually found that catalog. We found the guy who went there and picked it up. Well, you had, yeah. When you're talking about the IPR had a totally different record and a totally different burden, right? A different standard of proof. It has a lower standard of proof, yes. Right. Right. Well, I'm not going to get mad at you. But what you said begs the question of why we're here. I mean, if you say that what you're appealing here, the judgment here, is of no consequence to anyone, why are we here? I didn't quite say that. What I meant, well, it might have been at the time we appealed it. But if you're familiar with the oil energy case, which says IPRs may or may not be constitutional, at least that's the suggestion of the chatter amongst the community, now that the Supreme Court has granted cert on that, it may turn out that it becomes very important to be in front of you now to have the ALJs or have the commission's decision overturned. But it's also true that even if that comes to pass, that ITC's decision would not be binding on any future district court proceeding. And you could present whatever record you presented at the IPR there. I agree with you, Your Honor. That's true. Could I reserve some time, please? Yeah, we'll restore two minutes of your time. OK. Thank you. All right, you're splitting your time, Ms. Valentine, and your government ITC attorney. Yes, Your Honor. Good morning, you may please look forward. Could we lead with the chief's question, the last question? Is it your understanding that if, hypothetically, we were to affirm this, there would be nothing precluding the appellant here from pursuing its defense of the IPR decision in the upcoming federal circuit appeal? Yes, Your Honor, so the commission's opinion, and this court has held in Texas instruments, that commission is administering its trade statute. Our decisions on validity are strictly for the purposes of our investigations. We have no preclusive effect on any other district court or the PTO as far as how they would invalidate a court. As of the laws right now, only district courts are the courts and the PTO. Well, that's true of you. But we're talking about an instance if we were, hypothetically, to affirm what you did. So that, too, I assume your answer would be that that, too, would have no preclusive effect. Correct, and I believe it's such a judgment, as well, that the court said even affirming a commission finding of invalidity, that still is limited to, certainly it would be persuasive, but it's limited to the commission's investigation. Moving on to the case, what is your understanding of what the commission said about the IDS? I mean, you heard your friend's argument with respect to whether that is clear error. Did they say stridently, or strongly, or by implication that this stuff is absolutely irrelevant? Or how far did they go? For the information disclosure statement? Yes. Your Honor, so the insurance argument is that the statement was an admission. And the commission found, as Judge Chin was questioning, that it's ambiguous. The question of public accessibility is the question the commission had to answer. And all of its analysis of the evidence was through that lens. The question of whether or not the IDS answered that, the commission found was of little weight. And incidentally, even the PTO found it of little weight in its final written decision and did not consider it an admission under its own rules. So there is nothing in that statement for the commission to latch onto to say. Well, even if it's not an admission, does that mean necessarily that they can't consider it as a factor, as some evidence? Yes, Your Honor, certainly. But the question is how much weight is in it the commission should give it. The real problem the instrument has with the commission's analysis is that they came to a conclusion that the instrument didn't like. The commission, however, exhaustively looked at all the evidence that the instrument presented. Well, I guess the other side's argument is, OK, maybe none of these individual pieces are a dead ringer for establishing that this is a printed publication. Nevertheless, each little piece is at least circumstantial evidence of something. It's a little bit probative to help us move down the field a little bit to get closer and closer to a conclusion that this is, in fact, a printed publication. And ultimately, where there's a lot of smoke, there's fire. And so that was the analysis that was actually missing here in that, although none of these pieces of evidence maybe build the entire house, each one is a brick. And then when you put all the bricks together, voila, there's a house. Your Honor, that is the instrument's argument. And that is the analysis that the commission looked at. The problem is that there weren't enough bricks to reach the clear and convincing evidence threshold. And that is what the commission. Are you laying down, do you think, a hard and fast rule that says circumstantial evidence could never meet the clear and convincing? Oh, certainly not, Your Honor, certainly not. The problem here is the instrument had a burden of proof of clear and convincing evidence. And in looking at the evidence through the lens of whether or not the document was the catalog, was publicly accessible, was the critical date, it did not reach that threshold. That was the commission's conclusion. And substantial evidence supports the commission's finding. So what's your response to the fact that it looks like the commission just walked through each piece of evidence and found each piece of evidence not enough standing on its own? Do you think that there's enough language in there for us to be satisfied that the commission really looked at the totality of the bricks? So, Your Honor, the commission did not use the magic language, perhaps, that instrument would have preferred of in looking at all the evidence as a whole. But certainly, it cannot accuse the commission of ignoring any of the evidence. And as Your Honor pointed out, it looked at it and said, OK, this has maybe a little appropriate value. This has no appropriate value. And then, if the conclusion stated, based on the evidence, the instrument didn't satisfy its burden of proof, I don't believe the commission was required to do anything more explicit than that. Your Honor, do you have any further questions? Sure. OK, thank you very much. OK, thank you. Thank you. May it please the court, Sheila Swarup Kenobi-Martin, counsel for the Nimble Biocare Interveners. Can I ask you just the estoppel argument that I was asking your co-counsel over there? Is it your understanding that if we were to hypothetically affirm the ITC decision here, there's still nothing stopping the other side from continuing to defend and pursue the invalidation decision of the patent in the IPR? Your Honor, our understanding is the same as that of the ITCs, is that petitioners or appellants would be free to pursue their IPR arguments. Certainly, the ITC proceeding may be persuasive as to the PTAB, but we don't believe there would be any preclusive effect with regard to affirming a Section 337 violation with regard to this patent. And that's the same with respect to any proceeding that might occur in the district court. That's our understanding. That's correct, Your Honor. Appellants, during his argument, had mentioned some evidence that he believed that the commission did not properly consider. He mentioned sales of the SPI implant. We believe there's substantial evidence that the commission did find that there was no evidence that any sales occurred in the US, first of all, and then secondly, before the critical date. The only evidence in the record, which is that joint appendix site 3908 and 3909, was that there were sales beginning in 2003, but again, no particular date prior to May 2003. Counsel also mentioned training sessions, and the suggestion that should be drawn that somehow training sessions occurred before the critical date. But again, the commission did have facts in the record, specifically joint appendix site 4332, in which Dr. Framovich testified that there may be some delay between the time that clinicians were identified and training courses actually occurred. Counsel also mentioned that this SPI implant was a very radical new implant, and of course, training would be occurring with regard to this implant. Joint appendix site 4333 is testimony from Dr. Framovich explaining that because it was such a new implant, he wouldn't necessarily be training practitioners on that implant, but would start with other implants, again, undermining any suggestion that training was occurring somehow before May 2003, when there's certainly no evidence in the record to suggest that such training occurred. And despite an opportunity to do it, they never followed up on that questioning of Dr. Framovich. That's correct, Your Honor. The inventors, the four inventors on the 977 patent were available to appellants to depose and to present testimony from. No such testimony was presented from either of those inventors or from anyone else that may have attended a training course as to when that may have occurred and what was shown in any such course. OK, do you want to address your alternative argument? Yes, Your Honor, and the alternative is it is an alternative argument in the sense that if there is a finding that the commission's findings regarding lack of public accessibility are not supported by substantial evidence, Nobel has proposed a modified construction of the term coronal region having a fresco-clonical shape. And that's a modified construction that we're proposing. We believe that within the grammatical structure of this claim, the term having a fresco-clonical shape is not meant to be a property or something that's included within the coronal region, but rather is a characteristic of the coronal region. It's an adjectival phrase, similar to other phrases that this court has construed, for example, in Shire v. Watson in her polyprophyllic matrix. We view this particular claim phrase as being adjectival and modifying the term. As if the claim said a fresco-clonical-shaped coronal region? That's correct, Your Honor. But it doesn't say that. It says a coronal region having a fresco-clonical shape. That's correct. And we believe within the grammatical structure, and there has been other cases, the Cacase District Court case that we cited, where the term having a curvilinear profile was determined to be a modifier of the surface limitation in that claim. So we believe in the context of the claim and the context of the specification, where the description is that this taper of the region must be of a sufficient size to allow bone to elastically expand over the region, that the term coronal region having a fresco-clonical shape is meant to refer to a particular shape of the region. Now, when you argue that as what you call an alternative ground for affirmance, I mean, even if we did disagree with that construction and agreed with yours, wouldn't that still have to be remanded? Well, Your Honor, we believe when we briefed this that the construction we proposed for the ITC had the adjectival phrase in it and also had a component that it permits bone to relapse upon insertion of the implant. During the proceedings below, there was really no dispute that the accused products and the domestic industry products, in fact, had a coronal region with a fresco-clonical shape. So we believe there's sufficient evidence in the record, even under a modified claim construction, for this court to affirm the Section 337 violation under our modified proposal. Even though it's a fact finding, you're saying there was no argument or that the other side essentially conceded the fact. There was no dispute that the accused products and the domestic industry products, in fact, had a coronal region that was entirely fresco-clonically shaped. And the prior art that was asserted, the catalog implant there, did not have a coronal region with an entirely fresco-clonical shape. But they argue that, I mean, their argument in response to you is that it would still anticipate. So I mean, I still think there's a factual debate. Well, with regard to the record below, the appellants did not take the position that the SPI implant had a coronal region that was entirely fresco-clonical. And that's Joint Appendix Site 5827, is where they presented their invalidity charts. And the chart being shown was just the top. So your argument is that they waived their ability to make that argument here? Well, our argument is that there's sufficient facts in the record, should the claim construction be applied, to find no invalidity based on the SPI implant, and also infringement in the finding of domestic industry, based on the current record. OK. Thank you. Thank you. I'll try to be very quick, Your Honor. Specifically, what the commission said is neither respondents nor the investigative staff assert that the patentees characterized the 2003 Alpha Biotech catalog as prior art during the prosecution of 977. For example, by specifically identifying the catalog as prior art in the application response to an examiner's rejection. So they clearly looked at it in IDS. They said it's in IDS, we don't have to consider it. That's an appendix at 42, that's the commission's decision. The other thing, Your Honor, is that the further we get from the evidence, the more abstract the analysis became, and the less successful the appellants were, unfortunately. When we started at the ITC, we had the investigative staff on board that the patent, while it was invalid, was unenforceable. When ALJ Shaw got done, he said, OK, well, it's unenforceable, but it's invalid. And now we've gotten to the point where, by this analysis methodology, now nothing. We're supposed to review the ITC's decision, not the staff. So with respect to the claim construction, there is extensive analysis in the opinion. And I think that is at 14 to 21. So they spent a lot of time considering this question about whether coronal region, that includes a frustaconical shape that permits bone to relapse upon implant insertion, how to deal with that. And what they did, they basically agreed with the ALJ, the respondents, the staff, and said, it means partly or entirely. And Your Honor, respectfully, I don't mean to raise a fact issue here, but I don't believe that we ever conceded that under that construction, which was never before us, and that we never litigated, where you just have a wholly frustaconical region, but without the implant part, or without the bone relapse part, we never actually, I don't think we said anything that said, yes, we agree that infringes. Because in fact, if you look at the claim, it says, and this is raising non-infringement invalidity questions. If you look at the claim, it says, comprising a coronal region and apical region. It doesn't say there can't be a middle in the middle, another piece in between the coronal and apical regions, that just happens to be a cylinder. And therefore, two things. A, you could still have, and then sex, that's an invalidity opinion, instead of invalidity position is still there, even with that amended claim, which I don't believe you should do. And then secondly, with respect to infringement, if you look at the appendix, you will see that it is not. If we're going to say having a frustaconical region is now closed, and now that term is closed, and it has to have a frustaconical region, we don't have a closed, we don't have a purely frustaconical region. Because if you look in the appendix, we've got a bunch of grooves that take up most of the surface. So I think it's now a fact question, well, if it's closed and having means closed, then can I now have all these other things in there, including all these certain groups that make it very much not a frustaconical surface. So, your honor, I would respectfully submit that if you have any consideration to reopen a record, consider that amended claim construction, you send it back to the ALA. Thank you, we've got both sides and the case is submitted.